# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LENZA H. MCELRATH, III, derivatively on behalf of UBER TECHNOLOGIES, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2017-0888-SG |
| TRAVIS KALANICK, GARRETT CAMP, RYAN GRAVES, ARIANNA HUFFINGTON, YASIR AL-RUMAYYAN, WILLIAM GURLEY, DAVID BONDERMAN, and SALLE YOO, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| UBER TECHNOLOGIES, INC., | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  December 4, 2018
Date Decided:  April 1, 2019

Michael J. Barry, Jeff A. Almeida, and Rebecca A. Musarra, of GRANT & EISENHOFER P.A., Wilmington, Delaware, *Attorneys for Plaintiff.*

R. Judson Scaggs, Jr., Susan W. Waesco, and Sabrina M. Hendershot, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Susan S. Muck, Kevin P. Muck, and Marie C. Bafus, of FENWICK & WEST LLP, San Francisco, California, *Attorneys for Defendants Garrett Camp, Ryan Graves, Arianna Huffington, Yasir Al-Rumayyan, William Gurley, and David Bonderman.*

Donald J. Wolfe, Jr., T. Brad Davey, J. Matthew Belger, and Jacob R. Kirkham, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF

COUNSEL: Joseph G. Petrosinelli and Kenneth J. Brown, of WILLIAMS & CONNOLLY LLP, Washington, District of Columbia, *Attorneys for Defendant Travis Kalanick*.

Jody C. Barillare, of MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; OF COUNSEL: Susan D. Resley, of MORGAN, LEWIS & BOCKIUS LLP, San Francisco, California; Marc J. Sonnenfeld, of MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania, *Attorneys for Defendant Salle Yoo*.

A. Thompson Bayliss and Michael A. Barlow, of ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: Mark P. Gimbel and C. William Phillips, of COVINGTON & BURLING LLP, New York, New York; Bryant Pulsipher, of COVINGTON & BURLING LLP, San Francisco, California, *Attorneys for Nominal Defendant Uber Technologies, Inc*.

GLASSCOCK, Vice Chancellor

In the popular fable often attributed to Aesop,[1] a scorpion stings a frog that is ferrying it across a river, dooming both scorpion and frog. "Why would you do that?" asks the frog, dying. "It is my nature," replies the drowning scorpion, "as you knew yourself when you let me on your back." The Plaintiff in this unusual derivative action blames the Defendant directors of Uber Technologies, Inc. ("Uber") on similar grounds, with then-CEO Travis Kalanick cast as the scorpion.

According to the Plaintiff, Kalanick wanted to boost Uber's development of a self-driving car by hiring former Google employees, one of whom, Anthony Levandowski, had recently been employed at Google working on that firm's self-driving car project. Levandowski had formed his own firm in the same field, Ottomotto, LLC ("Otto"). Uber management began to investigate acquisition of Otto. Despite the fact that, per the Plaintiff, Kalanick knew that Levandowski had purloined intellectual property and trade secrets from Google, Uber management hired an outside firm, Stroz Friedberg ("Stroz"), to investigate whether such a taking of IP had occurred. Eventually, management recommended acquisition of Otto to the directors, at an April 11, 2016 meeting of Uber's Board of Directors (the "Board"). By that time, Stroz had already conducted some diligence review and reached preliminary conclusions as to whether Levandowski and his associates at Otto had retained Google IP when they left that company. Some report of Stroz'

---

[1] In fact, per Wikipedia, the fable is of Russian origin.

diligence was made by management to the Board, apparently satisfying the Board. The Board also discussed the Merger Agreement, which indemnified Otto employees for prior bad acts to the extent those had been truthfully disclosed to Stroz and did not require Otto to indemnify Uber for any liability Uber acquired. The Amended Complaint is silent as to the nature or contents of management's presentation to the Board on the Stroz investigation, but the complaint does allege that the directors failed to ask to see the materials Stroz produced or otherwise gather information, independent of management, regarding the diligence. At the April 11, 2016 meeting, the Board approved the transaction. After Uber acquired Otto, a Google employee noticed that Otto was using what appeared to be Google technology. Google sued Otto and Uber for intellectual property ("IP") infringement, and Uber ultimately settled for $245 million.

The Plaintiff brings this suit, purportedly on behalf of Uber, against Kalanick, the directors who approved the transaction, and others, and seeks damages arising from the Otto acquisition. He argues that Kalanick's promotion of the Otto merger, in light of what he asserts is Kalanick's essentially bad character, should have been a red flag to the directors. The Plaintiff points to Kalanick's alleged history as a copyright infringer and the fact that, under his control, Uber had acquired a reputation for breaching local taxi regulations in its ride-share business. As a result, the Plaintiff argues, the Board must have been well aware that Kalanick was a

2

scofflaw. The Plaintiff posits, therefore, that the Board must have known that whatever the management representations regarding Stroz' findings, those representations were unreliable. As a consequence, by not insisting to read Stroz' preliminary findings before entering the merger agreement, and in not reading the final Stroz report before the closing of the merger, the directors breached fiduciary duties. Further, noting that breaches of the duty of care are exculpated by Uber's charter, the Plaintiff alleges that the directors' failure to insist on reading the reports was an omission in bad faith, and that the directors who approved the merger agreement (or failed to stop the merger from closing) are accordingly liable for breach of the duty of loyalty.

The Defendants have moved to dismiss. Under our well-known model, it is the province of the directors to deploy corporate assets, including choses-in-action like the one the Plaintiff attempts to plead derivatively here. The Plaintiff did not make a demand on the Board to pursue this litigation; therefore, under Court of Chancery Rule 23.1, his derivative complaint must be dismissed unless he demonstrates that demand would have been futile on account of the directors' inability to exercise business judgment in regard to the matter. According to the Plaintiff, addressing a demand to those directors who approved or failed to stop the transaction, and who remain on the Board, would be futile because of the likelihood of their liability. While the majority of the directors who would evaluate a demand

3

joined the Board after the Otto acquisition, the Plaintiff alleges that a majority lacks independence from Kalanick, and therefore could not bring their business judgment to bear, excusing demand. The Defendants disagree.

I find that a majority of the Board who would evaluate a demand is disinterested and independent, and thus the action must be dismissed under Rule 23.1.

My reasoning follows a recitation of the background facts, below.

## I. BACKGROUND

The Defendants moved to dismiss the Plaintiff's Verified Amended Stockholder Derivative Complaint (the "Amended Complaint") under Court of Chancery Rule 12(b)(6), failure to state a claim, and Rule 23.1, failure to make a pre-suit demand. As a result, the background facts below are drawn from the Amended Complaint and documents incorporated therein.[2]

---

[2] The parties disagree on what documents are incorporated by reference into the Amended Complaint. *See* Docket Item [hereinafter, "D.I."] 96–100. The Plaintiff agrees that the following documents are incorporated by reference: Uber's charter for the purpose of taking judicial notice of Uber's exculpatory provision; the Stroz Friedberg final report; a redacted version of the Merger Agreement between Uber Technologies, Inc. ("Uber") and Ottomotto, LLC ("Otto"); a redacted version of the indemnification agreement between Uber and Otto that accompanied the Merger Agreement; and a redacted version of a slide deck used in Uber management's presentation to the Board on the Otto acquisition. *See* D.I. 96. The Plaintiff contests the incorporation of the testimony of Uber director William Gurley in another litigation. *See* D.I. 96, at 3. The Plaintiff himself quotes (and references) parts of Gurley's testimony in the Amended Complaint. Gurley's entire testimony is not incorporated; however, I find it appropriate to consider the full questions and answers from which the Plaintiff quotes.

4

*A. Parties*

Plaintiff Lenza A. McElrath, III is a California resident and a stockholder of Uber.[3]

Nominal Defendant Uber is a privately held company incorporated in the State of Delaware.[4] Defendants Garrett Camp and Travis Kalanick co-founded Uber in 2009.[5] Both Camp and Kalanick have served as Uber directors since Uber was founded.[6] Kalanick also served as Uber's CEO from December 2010 until June 2017.[7] Kalanick previously founded a company called "Scour," which facilitated the sharing of music and theatrical film releases in violation of copyright, and which eventually declared bankruptcy.[8]

Defendant Ryan Graves has served as an Uber director since 2010.[9] Graves briefly served as Uber's first CEO, but at all times relevant to this litigation, Graves was Uber's head of global operations.[10]

---

[3] Am. Compl. ¶ 16. McElrath "has been a stockholder of Uber at all material times alleged in this Complaint." *Id.*
[4] *Id.* ¶ 17. Uber's corporate headquarters are located in San Francisco, California. *Id.*
[5] *Id.*
[6] *Id.* ¶¶ 18–19.
[7] *Id.* ¶ 18.
[8] *Id.* ¶¶ 27, 28.
[9] *Id.* ¶ 20.
[10] *Id.*

Defendant William Gurley served as an Uber director from 2011 until June 21, 2017.[11] Gurley is a partner of Benchmark Capital Partners VII, L.P. ("Benchmark").[12] Benchmark is an Uber stockholder.[13]

Defendant David Bonderman served as an Uber director from 2011 through June 13, 2017.[14] Bonderman is a partner of TPG Capital L.P. ("TPG").[15] TPG is an Uber stockholder.[16]

Defendant Arianna Huffington has served as an Uber director since April 27, 2016.[17] Kalanick unilaterally appointed Huffington to Uber's Board.[18]

Defendant Yasir Al-Rumayyan has served as an Uber director since June 1, 2016.[19] Al-Rumayyan is the managing partner of Saudi Arabia's Public Investment Fund, which is an Uber stockholder.[20]

Defendant Salle Yoo served as Uber's General Counsel until May 2017,[21] and was Uber's General Counsel during the events that led to this litigation.

---

[11] *Id.* ¶ 23.
[12] *Id.*
[13] *Id.*
[14] *Id.* ¶ 24.
[15] *Id.*
[16] *Id.*
[17] *Id.* ¶ 21.
[18] *Id.* ¶ 110.
[19] *Id.* ¶ 22.
[20] *Id.*
[21] *Id.* ¶ 26.  Yoo also served as Uber's Chief Legal Officer until November 2017. *Id.*

*B. Uber Acquires Otto*

Uber "operates the world's dominant ride-sharing mobile app."[22] It generated $7.5 billion in revenue in 2017.[23] Per the Amended Complaint, Uber's business practices have come under scrutiny since its founding for ignoring or thwarting local regulations that conflicted with Uber's business, specifically local taxi or car-for-hire service laws.[24]

Otto was founded by Anthony Levandowski, a former employee of "Waymo."[25] Waymo is a subsidiary of Google,[26] and is engaged in developing self-driving technology.[27] Uber sought to jumpstart its own efforts to develop self-driving vehicles by acquiring Otto.[28] Uber executives began efforts to recruit Levandowski in June 2015, when he still worked for Google.[29] In one meeting with Uber executives, Levandowski purportedly asked "what Uber would be willing to pay for the entire Google self-driving staff."[30] During the "recruitment period," Kalanick personally exchanged text messages with Levandowski.[31]

---

[22] *Id.* ¶ 17.
[23] *Id.* ¶ 1.
[24] *Id.* ¶¶ 29–33.
[25] *Id.* ¶ 2.
[26] For simplicity, I use "Google" to collectively refer to Google (now known as Alphabet) and Waymo (which has had different names in the past). *See id.* ¶ 38 n.3.
[27] *Id.* ¶ 2.
[28] *Id.* ¶ 1.
[29] *Id.* ¶ 39.
[30] *Id.*
[31] *Id.* ¶ 40.

Levandowski founded the precursor to Otto on January 14, 2016, while still employed at Google.[32] Levandowski then left Google on January 27, 2016.[33] At the time Levandowski resigned, he possessed tens of thousands of files containing Google trade secrets and confidential information, and he retained those files after he resigned.[34] Following his resignation from Google, Levandowski continued to exchange text messages with Kalanick, in which they discussed Otto's status and poaching other Google employees to join Otto.[35] Levandowski and Kalanick also met personally on multiple occasions to discuss the acquisition of Otto by Uber, purportedly during a series of long nighttime walks.[36]

On February 22, 2016, less than a month after Levandowski left Google, Otto and Uber signed a Term Sheet for Uber to acquire Otto.[37] The acquisition valued Otto at $680 million.[38] In the less than one month between Levandowski leaving Google and Otto signing the Term Sheet, Otto also hired dozens of other former Google employees.[39] At the time it was acquired, Otto operated out of

---

[32] *Id.* ¶ 44.
[33] *Id.*
[34] *Id.* ¶ 42. These files included technical drawings and diagrams, texts and notes, e-mails, source code files, and pictures and videos. *Id.*
[35] *Id.* ¶ 45.
[36] *Id.* ¶ 40.
[37] *Id.* ¶ 46.
[38] *Id.* ¶ 57.
[39] *Id.* ¶ 4.

Levandowski's house and had no real operations.[40] Kalanick testified in a different litigation that "[Uber] basically [was] hiring [Levandowski] and his team."[41]

### C. Uber Hires Stroz Friedberg to Investigate Otto

In March 2016, as part of its due diligence on Otto, Uber hired Stroz, a forensic firm, to conduct an independent investigation under the supervision of Uber's outside counsel, Morrison & Foerster.[42] Stroz was primarily tasked with determining whether Levandowski and other former Google employees at Otto "took with them or retained confidential and/or proprietary information from their former employer, Google."[43]

Uber executives, including Kalanick, knew that Levandowski had retained confidential information from his time at Google.[44] At a March 11, 2016 meeting, Levandowski told Kalanick and other Uber executives that he possessed proprietary and confidential information on Google's self-driving vehicle technology on his personal storage device or disks.[45] An Uber executive told Levandowski not to

---

[40] *Id.* ¶ 47.
[41] *Id.*
[42] *Id.* ¶ 49.
[43] *Id.* ¶¶ 5, 49; *see also* Transmittal Aff. of Andrew J. Peach, Esq. in Support of Opening Br. in Support of Nom. Def. Uber's Mot. to Dismiss [hereinafter, "Peach Aff."] Ex. 5, at 3, "Scope of Engagement."
[44] Am. Compl. ¶ 50.
[45] *Id.*

destroy his storage device, and Kalanick told Levandowski that "he wanted nothing to do with the disks" and to "do what [Levandowski] needed to do."[46]

In April 2016, Stroz delivered its preliminary findings to Morrison & Foerster, Salle Yoo (then Uber's General Counsel), and Otto.[47]  Yoo received the preliminary findings no later than April 10, 2016.[48]  After receiving the preliminary findings, Yoo expressed "serious reservations" to Kalanick regarding the acquisition of Otto.[49] Yoo did not inform or otherwise speak to Uber's other directors about Stroz' preliminary findings.[50]  Stroz' preliminary findings included that Levandowski and others at Otto possessed confidential and proprietary Google information.[51]  Stroz continued its investigation and, as discussed below, later delivered a final report on August 5, 2016.[52]

*D. Uber's Board of Directors Approves the Otto Acquisition on April 11, 2016*

Uber's Board of Directors met on April 11, 2016.[53]  Kalanick, who was both a director and CEO of Uber at the time, presented the transaction to acquire Otto to

---

[46] *Id.*
[47] *Id.* ¶ 52.
[48] *Id.* ¶ 53.
[49] *Id.*
[50] *Id.*
[51] *Id.* ¶ 55.
[52] *Id.*
[53] *Id.*

10

the Board on the same day.[54] Although he was aware of them,[55] Kalanick did not specifically present Stroz' preliminary findings.[56] A slide deck shown to the Board detailed Uber's agreement, as part of the merger, to indemnify Otto from certain IP and employment liability; indemnification was conditional, and varied by circumstance.[57] After Kalanick's presentation, the Uber Board approved Uber entering into a merger agreement with Otto (the "Merger Agreement").[58] The Merger Agreement valued the Otto acquisition at $680 million.[59]

Uber's directors were aware that Stroz, a forensic investigative firm, had been hired to conduct diligence on Otto.[60] However, none of the directors asked specifically about the results of the Stroz investigation before approving the merger with Otto.[61] The risk of litigation brought by Google regarding IP or the solicitation of Google employees was discussed, as was the importance of due diligence.[62] The Amended Complaint makes no allegation regarding a discussion of due diligence at

---

[54] *Id.* ¶¶ 54, 78.
[55] *Id.* ¶ 10.
[56] *Id.* ¶ 54.
[57] *Id.* ¶ 78; s*ee also* Peach Aff. Ex. 8. Again, the Plaintiff acknowledges that the slide deck used by management, in its redacted form, is integrated into the Amended Complaint. D.I. 96.
[58] Am. Compl. ¶ 57.
[59] *Id.*
[60] *Id.* ¶ 5
[61] *Id.* ¶¶ 53, 54.
[62] *Id.* ¶ 75. The Plaintiff makes no other allegations regarding management's presentation or the Board's approval process. As a result, there are no allegations from which to infer that the Board's approval of the Otto merger was lacking in any regard other than that Kalanick did not specifically share Stroz' preliminary findings or that the Board did not specifically ask about Stroz' preliminary findings.

11

the April 11 meeting.[63] However, one director later testified in a different litigation: "There was a discussion about the indemnity. There was a discussion about it being atypical. That led to questions about why we were okay with that. That led to a discussion about the due diligence that had been done. And we as a group made a decision that we're going to move forward because the due diligence was okay."[64] As a result, the record at this pleading stage shows that there was, at least, a cursory discussion of diligence in general, and a representation by management that due diligence was "okay."[65] Inferences that that diligence was discussed (however briefly), that management represented diligence to be okay, and that the directors

---

[63] The Amended Complaint does not allege that the Board was told *nothing* about diligence, nor does it allege what the Board was told.

[64] Am. Compl. ¶ 63; Peach Aff. Ex. 6, at 953:17–954:6. The Amended Complaint quotes Gurley as saying that the indemnification terms were "atypical." While the full transcript of Gurley's testimony is not incorporated into the Amended Complaint, the question and answer from which the Plaintiff quotes Gurley must be. Gurley says the word "atypical" on three occasions in his testimony. Peach Aff. Ex. 6, at 949:7, 951:19, 954:1. On the third occasion, the question was: "And, Mr. Gurley, as to the assertion that the diligence effort had been positive, you are not completely sure if Mr. Kalanick made that statement or if that statement had been made by one of the deal team members, possibly Mr. Percher; isn't that right?" Peach Aff. Ex. 6, at 953:17–21. Gurley's full response was:

> In an effort to be as helpful as possible, I'll state generically what happened, and then we can get into esoteric details if we want to. There was a discussion about the indemnity. There was a discussion about it being atypical. That led to questions about why we were okay with that. That led to a discussion about the due diligence that had been done. And we as a group made a decision that we're going to move forward because the due diligence was okay.

Peach Aff. Ex. 6, at 953:22–954:5.
Gurley was then cut off. Peach Aff. Ex. 6, at 954:7.

[65] In addition to Gurley's testimony, management's slide deck, even in its shortened and redacted form, references "Pre-Signing Due Diligence," and notes, either summarizing historical events or detailing planned events, that a forensic expert was hired, that Uber received a report from the forensic expert, and that based on Uber's review of facts, Uber decided to move forward. Peach Aff. Ex. 8.

failed to ask further questions about Stroz' findings or demand the primary documents from Stroz, are, under the circumstances, the most favorable that can be drawn for the Plaintiff.[66]

The Merger Agreement excluded post-closing indemnification to Uber for breaches of representations and warranties by the seller, Otto.[67] Relatedly, the Merger Agreement contained no post-closing indemnification remedy for Uber, the buyer, for Otto's liabilities.[68] The Directors were specifically made aware that a post-closing indemnification remedy for Uber was omitted.[69] According to the Amended Complaint, the Merger Agreement also included representations by Otto regarding its ownership of IP; however, the Amended Complaint lacks specifics.[70]

According to side agreements to the Merger Agreement, Levandowski (and other Otto employees) received indemnification from Uber for "bad acts" committed pre-signing that "reasonably [arose] or result[ed] from any facts, circumstances, activities or events contained or disclosed on the face of" the final report by Stroz.[71]

---

[66] At Oral Argument, the Plaintiff argued that the directors did not ask specifically about the Stroz investigation but were told by Kalanick that due diligence was "clean," but because this representation came from Kalanick, who was known to be of bad character, the Board could not rely on Kalanick's representations; to fulfill their fiduciary duties, the directors needed to inquire specifically about Stroz' findings. Oral Argument Tr. 63:11–67:9, 72:11–76:12, 92:1–3.
[67] Am. Compl. ¶ 59.
[68] *Id.* ¶ 62.
[69] *Id.* ¶ 63.
[70] *Id.* ¶ 81; *see also id.* ¶ 62 ("[T]he Merger Agreement contains customary representations regarding Otto's ownership of IP . . . .").
[71] *Id.* ¶ 65.

13

Post-signing bad acts, and undisclosed pre-signing bad acts, were not indemnified.[72]

These side indemnification agreements were discussed at the April 11, 2016 Board meeting.[73] The Merger Agreement itself provides that "any Pre-Signing Bad Acts . . . shall be disregarded in determining whether any of the conditions set forth in this Section 6 have been satisfied."[74] Section 6 contained the closing conditions of the merger.[75] Pre-signing "Bad Acts" was defined in the Merger Agreement to include fraud and intentional conduct that constituted IP infringement, among other things.[76] As a result, bad acts committed by Levandowski and other Otto employees before the Merger Agreement was signed would be indemnified by Uber if disclosed to Stroz, and, furthermore, those bad acts could not be used to find that a closing condition in the Merger Agreement had not been met.

At the time the Board approved the Merger Agreement, the Board was comprised of Camp, Kalanick, Graves, Gurley, and Bonderman.

*E. The Stroz Final Report on August 5, 2016*

Stroz' final report was "delivered" on August 5, 2016.[77] The passive voice is intentional; the Amended Complaint does not state who at Uber reviewed the final

---

[72] *See* Peach Aff. Ex. 7 § 2.1(b)(iii). The Plaintiff has agrees that the Indemnification Agreement can be considered in its redacted form. D.I. 96.
[73] Am. Compl. ¶ 78.
[74] *Id.* ¶ 79; *see also* Peach Aff. Ex. 9 § 6. The Plaintiff agrees that the Merger Agreement can be considered in its redacted form. D.I. 96.
[75] Am. Compl. ¶ 79.
[76] *Id.*
[77] *Id.* ¶ 69.

14

report. The final report revealed that Levandowski and other former Google employees at Otto, at the time Stroz had conducted its investigation, retained hundreds of thousands of files, documents, and e-mails from their time at Google.[78] According to Stroz' final report, Levandowski had dramatically understated the amount of Google e-mails on his laptop and had recently accessed several of the e-mails; Stroz found it "difficult to believe that Levandowski was not . . . fully aware of the extent of the data that he had retained [from Google]."[79] Stroz also found that Levandowski had researched how to securely wipe files from his computer and had attempted to empty the trash folder on his computer during an interview with Stroz.[80]

*F. The Otto Transaction Closes, Google Files Suit, and Changes to the Uber Board of Directors*

As mentioned, Uber's Board of Directors approved the merger with Otto on April 11, 2016. Following approval of the merger, but prior to closing, Uber added two director seats to its Board of Directors—expanding the number of directors from five to seven. On April 27, 2016, Huffington was added as a director.[81] Following which, on June 1, 2016, Al-Rumayyan was added as a director.[82]

Therefore, Uber's Board of Directors after June 1, 2016, and before closing of the merger on August 18, 2016, consisted of Camp, Kalanick, Graves, Gurley,

---

[78] *Id.* ¶¶ 70–72.
[79] *Id.* ¶ 72.
[80] *Id.* ¶ 73.
[81] *Id.* ¶ 21.
[82] *Id.* ¶ 22.

Bonderman, Huffington, and Al-Rumayyan. Stroz' final report was delivered on August 5, 2016, prior to closing. The Uber directors did not read Stroz' final report or otherwise learn of its findings,[83] and the Amended Complaint makes no allegation as to who at Uber may have read the final report or whether anyone made the directors aware that the final report was available.[84] The findings in Stroz' final report indicated that Otto's employees possessed Google IP; according to the Plaintiff, this IP retention may have been in breach of Otto's representations in the Merger Agreement regarding IP ownership.[85] Again per the Plaintiff, if Otto had breached its IP ownership representations, Uber had the right not to close the transaction with Otto (based on an interpretation of the Merger Agreement that the Defendants contest).[86] None of the Uber directors attempted to prevent closing of the acquisition of Otto.[87] I infer that none of the directors inquired whether the final

---

[83] *Id.* ¶¶ 56, 111, 112. The Amended Complaint only alleges with particularity that Gurley did not read Stroz' final report (or learn of its findings), and that Huffington and Al-Rumayyan allowed the merger to close without reference to the final report (or without insisting on an explanation of its findings). *Id.* However, it is reasonable to infer (and is central to the Plaintiff's argument) that none of the directors read (or learned the findings) of the final report, and the Defendants do not argue that they did. *See generally* Oral Argument Tr.

[84] The Amended Complaint simply alleges that the final report was available to the directors. Am. Compl. ¶ 68. However, with no allegations of who at Uber actually received the final report, it is not reasonable to infer that the directors were made aware that the report was available to them. It is a fair inference that the Defendant directors failed to inquire if the final report was available.

[85] *Id.* ¶ 81.

[86] *Id.* ¶ 82.

[87] *Id.* ¶ 83.

16

report was available. The transaction subsequently closed on August 18, 2016; Uber and Otto announced the merger only after the deal closed.[88]

On December 13, 2016, a Google employee was inadvertently copied on an e-mail from one of Google's vendors that also served Otto and Uber.[89] Attached to the e-mail was a drawing of an Otto circuit board, which Google believed resembled a Google circuit board, the design of which Levandowski had downloaded before resigning from Google.[90] Google then brought suit against Uber and Otto on February 23, 2017 in the U.S. District Court for the Northern District of California.[91] Uber disclosed Stroz' final report in connection with that action.[92] Uber had terminated Levandowski's employment by that point, having discharged him on May 30, 2017.[93] The presiding judge referred the case to the U.S. Attorney's Office in May 2017, "for investigation of possible theft of trade secrets."[94] Uber later settled the case with Google and paid Google $245 million.[95] The Plaintiff's theory of damages derives, in part, from this settlement; according to the Plaintiff, the Defendants breached their fiduciary duties, which led to the acquisition of Otto, the

---

[88] *Id.* ¶ 84.
[89] *Id.* ¶ 86.
[90] *Id.* ¶ 87.
[91] *Id.* ¶ 88.
[92] *Id.* ¶ 92.
[93] *Id.* ¶ 94.
[94] *Id.* ¶ 90.
[95] *Id.* ¶ 95.

purported use of stolen technology, and the ultimate settlement with Google for $245 million.[96]

In June 2017, Defendants Gurley and Bonderman both resigned from the Uber Board of Directors.[97] Gurley was replaced as director by non-party Matt Cohler; Cohler, like Gurley, is a partner at Benchmark.[98] Bonderman was replaced as director by non-party David Trujillo; Trujillo, like Bonderman, is a partner at TPG.[99] Kalanick was ousted by the Board as CEO in June 2017.[100]

On September 29, 2017, two additional members were appointed by Kalanick to the Uber Board of Directors; they are non-parties Ursula Burns and John Thain.[101] Kalanick appointed Burns and Thain after Kalanick was ousted as CEO of Uber in 2017.[102] The Amended Complaint does not state from where Kalanick derived the ability to appoint directors; presumably, Kalanick appointed Burns and Thain (and previously Huffington) consistent with Uber's Certificate of Incorporation.[103]

---

[96] *Id.* The Plaintiff's theory of damages also includes money "paid and wasted" to acquire Otto and the "massive amounts of attorneys' fees" Uber paid to defend itself in the Google litigation. *Id.*

[97] *Id.* ¶¶ 23–24.

[98] *Id.* ¶ 115.

[99] *Id.* ¶ 116.

[100] *Id.* ¶¶ 18, 117.

[101] *Id.* ¶¶ 117–118.

[102] *Id.* ¶ 117.

[103] *Id.*; s*ee also* Oral Argument Tr. 86:9–87:9.

18

The Plaintiff brought this action shortly thereafter, on December 13, 2017.  I note, in light of certain lacunae in the pleadings, that the Plaintiff did not bring a Section 220 books and record demand before filing this derivative suit.

*G. Procedural History*

On December 13, 2017, Plaintiff Lenza H. McElrath, III, filed this derivative action on Uber's behalf.  The Plaintiff amended his complaint on April 3, 2018.  On April 17, 2018, Nominal Defendant Uber, Defendants Camp, Graves, Huffington, Al-Rumayyan, Gurley, and Bonderman, and Defendant Kalanick separately filed Motions to Dismiss.  Defendant Yoo also filed a Motion to Dismiss on May 7, 2018.  On November 13, 2018, I heard Oral Argument on the outstanding Motions to Dismiss.  After Oral Argument, I received supplemental letters on November 21 and December 4, 2018, and thereafter considered the matter submitted for decision.

## II. ANALYSIS

The Plaintiff's initial Complaint detailed a derivative claim for breach of fiduciary duty against Defendants Kalanick, Camp, Graves, Huffington, Al-Rumayyan, Gurley, and Bonderman (collectively the "Director Defendants"), who were Uber directors either at the time the Otto merger was approved and/or served as directors between the transaction's approval and closing.  The Plaintiff's Amended Complaint added a derivative claim for breach of fiduciary duties against Kalanick and Yoo (the "Officer Defendants") as officers of Uber, and a claim for

19

corporate waste against all the Defendants. The Defendants moved to dismiss all the claims brought against them under both Court of Chancery Rule 23.1, failure to make a demand, and Rule 12(b)(6), failure to state a claim. I turn first to the Motions to Dismiss under Rule 23.1, which I find are dispositive.

### A. Rule 23.1

According to Court of Chancery Rule 23.1, a derivative plaintiff must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[104] The Plaintiff here has alleged that such demand would be futile.[105] Nominal Defendant Uber disagrees, and has moved to dismiss the Amended Complaint under Court of Chancery Rule 23.1 for failure to make a demand. The Director Defendants (excluding Kalanick), Defendant Kalanick, and Defendant Yoo have joined Uber in its Motion. Yoo also proposes that regardless of whether demand is excused as to claims against the other Defendants, demand should not be excused as to the claims brought against her.[106] I start with the legal standard underlying Rule 23.1, before applying it.

---

[104] Ct. Ch. R. 23.1(a).
[105] Am. Compl. ¶¶ 99–119.
[106] Def. Yoo's Opening Br. in Support of Her Mot. to Dismiss, at 8–9.

## 1. The Rule 23.1 Legal Standard

The demand requirement in Rule 23.1 is an extension of the fundamental principle that "directors, rather than shareholders, manage the business and affairs of the corporation."[107] As a result, "the demand requirement serves to 'insure that a stockholder exhausts his intracorporate remedies,' 'provide a safeguard against strike suits,' and 'assure that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which does occur.'"[108] Where, as here, a derivative plaintiff did not make a pre-suit demand on the board,[109] the Court must dismiss the complaint "unless it alleges particularized facts showing that demand would have been futile."[110] Under the heightened pleading requirements of Rule 23.1,[111] conclusory "allegations of fact or law not supported by allegations of specific fact may not be taken as true."[112] In other words, "Rule 23.1 is not satisfied by conclusory statements or mere notice

[107] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[108] *Inter-Mktg. Grp. USA, Inc. v. Armstrong*, 2019 WL 417849, at *3 (Del. Ch. Jan. 31, 2019) (first quoting *Aronson*, 473 A.2d at 811; then quoting *Aronson*, 473 A.2d at 812; and then quoting *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988)).

[109] Am. Compl. ¶ 100.

[110] *Ryan v. Gursahaney*, 2015 WL 1915911, at *5 (Del. Ch. Apr. 28, 2015), *aff'd*, 128 A.3d 991 (Del. 2015) (TABLE).

[111] *Brehm*, 746 A.2d at 254 ("[P]leadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a).").

[112] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988), *overruled on other grounds by Brehm*, 746 A.2d 244.

pleading."[113]   Furthermore, I am limited to "the well-pled allegations of the complaint, documents incorporated into the complaint by reference, and judicially noticed facts."[114]

Our Supreme Court laid out the test for determining demand futility in *Rales v. Blasband*: a court must "examine whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations."[115]  The application of *Rales* depends on context.  For example, our Supreme Court's guidance in *Aronson v. Lewis*[116] is applicable where "a decision of the board of directors is being challenged in the derivative suit"[117]—in other words, when the business decision at issue is "an action taken by the board that would consider the demand."[118]  *Rales* itself applies, by contrast, where "the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit."[119]  That includes the situation "where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced . . . ."[120]  It also includes, as here, the comparable

[113] *Brehm*, 746 A.2d at 254.

[114] *Breedy-Fryson v. Towne Ests. Condo. Owners Ass'n, Inc.*, 2010 WL 718619, at *9 (Del. Ch. Feb. 25, 2010).

[115] 634 A.2d 927, 934 (Del. 1993).

[116] 473 A.2d 805 (Del. 1984), *overruled by Brehm*, 746 A.2d 244.

[117] *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) (discussing *Aronson*).

[118] *Inter-Mktg. Grp. USA, Inc. v. Armstrong*, 2019 WL 417849, at *4 (Del. Ch. Jan. 31, 2019).

[119] *Rales*, 634 A.2d at 933–34.

[120] *Id.* at 934 (Del. 1993) (internal citations omitted).

situation where members of the board who made the business decision in question remain on the board but are now in the minority.[121] The central question of a *Rales* inquiry, no matter the context, is the same: "whether the board can exercise its business judgment on the corporate behalf in considering demand."[122]

The business decision at issue here, made by Uber's Board, is the acquisition of Otto. At the time the Plaintiff filed his Complaint on December 13, 2017,[123] Uber's Board of Directors had been expanded to eleven members (the "Demand Board").[124] Only three members of the current Demand Board were directors when

[121] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 56–57 (Del. Ch. 2015) ("[T]he *Rales* test applies where a derivative plaintiff challenges a decision approved by a board committee consisting of less than half of the directors who would have considered demand, had one been made.").

[122] *Inter-Mktg. Grp. USA, Inc.*, 2019 WL 417849, at *4 (quoting *In re Duke Energy Corp. Deriv. Litig.*, 2016 WL 4543788, at *14 (Del. Ch. Aug. 31, 2016)).

[123] There is no allegation that the composition of the Demand Board changed between December 13, 2017, when the original Complaint was filed, and April 3, 2018, when the Amended Complaint was filed. Neither do the Defendants contend that the Amended Complaint necessitated a "new" demand. *See Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006); *In re Fitbit, Inc. Stockholder Derivative Litigation*, 2018 WL 6587159, at *11 (Del. Ch. Dec. 14, 2018).

[124] Am. Compl. ¶ 104.

Uber's Board voted to approve the merger with Otto.[125]   As a result—with the agreement of the parties[126]—I apply *Rales*.

According to *Rales*, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[127]   A director is considered interested—as the Plaintiff alleges here— where she would "face a substantial likelihood of personal liability for the conduct described in the complaint,"[128] among other circumstances.[129]   A director is

---

[125] Even if I were to accept, as I do not, the Plaintiff's framing that allowing the Otto acquisition to close was an *affirmative action* by Uber's Board of Directors, only two additional members of the current Demand Board would be implicated, which is still short of a majority. *See, e.g.*, *id.* ¶ 111 ("the Board . . . *agreed* to close and consummate the Uber-Otto transaction") (emphasis added).   The distinction between *affirmative action* by a board and *inaction* by the board is important when considering how to apply *Rales* and whether to apply *Aronson*. *See, e.g.*, *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) (distinguishing between a business decision and a violation of oversight duties).

[126] *See* Opening Br. in Support of Nom. Def. Uber's Mot. to Dismiss, at 17; Pl.'s Omnibus Answering Br. in Opp'n to Defs.' Mots. to Dismiss [hereinafter, "Pl.'s Omnibus Answering Br."], at 30.

[127] *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

[128] *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *10 (Del. Ch. Mar. 19, 2018) (citing *Park Emps.' & Ret. Bd. Emps.' Annuity & Benefit Fund of Chi. v. Smith*, 2017 WL 1382597, at *6 (Del. Ch. Apr. 18, 2017)).

[129] A director is also considered interested where, for example, "he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936 (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).   "Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales*, 634 A.2d at 936.

independent when "a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[130]

The Plaintiff claims that nine of the eleven directors on the Demand Board "are incapable of impartially considering demand"[131] and that therefore, demand is futile. The Plaintiff does not allege that two of the directors on the Demand Board, Ling Martello and Dara Khosrowshahi, are not impartial or otherwise unconflicted.[132] According to the Plaintiff, five of the nine challenged members of the Demand Board face a substantial likelihood of liability for the conduct described in the Amended Complaint, and seven[133] of the nine challenged members lack independence.[134] I first examine whether the five directors identified by the Plaintiff face a substantial likelihood of liability. I then turn to the Plaintiff's arguments on director independence.

### 2. No Member of the Demand Board (Other Than Kalanick) Faces a Substantial Likelihood of Liability

Uber's Certificate of Incorporation exculpates its directors from monetary liability for breach of fiduciary duty "[t]o the fullest extent permitted by the

---

[130] *Aronson*, 473 A.2d at 816, *overruled on other grounds by Brehm*, 746 A.2d 244.

[131] Am. Compl. ¶ 104.

[132] *Id.*

[133] The Plaintiff alleges that five of the seven Demand Board directors lack independence from Kalanick. The remaining two are alleged to lack independence from Gurley and Bonderman. I have not included Kalanick when counting which directors lack independence.

[134] Am. Compl. ¶¶ 106–110. Per the Plaintiff, three directors—Camp, Graves, and Huffington—are both interested and lack independence.

Delaware General Corporation Law."[135]   Therefore, to adequately allege that an Uber director faces a substantial likelihood of liability, the Plaintiff must plead "a non-exculpated claim against the directors based on particularized facts."[136]   The Plaintiff argues that five members of the Demand Board failed to act in good faith[137] and committed corporate waste[138] by approving the Otto merger or by allowing the merger to close.  The Plaintiff also pled a claim against Kalanick in his capacity as an officer of Uber.  I examine first the Plaintiff's arguments against Kalanick (as both an officer and a director), before turning to the Plaintiff's arguments against the other directors for bad faith and waste.

### a. Kalanick Faces a Substantial Likelihood of Liability as a Director and Officer of Uber

At the time Uber acquired Otto, Kalanick was both a director and the CEO of Uber.  In his Amended Complaint, the Plaintiff alleges that Kalanick personally helped to poach Levandowski from Google and that Kalanick was present in meetings where Levandowski admitted to retaining confidential information from Google.  The Plaintiff also alleges that, prior to the Board's approval of the Otto

---

[135] Peach Aff. Ex. 4, at 42.

[136] *See Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 62–63 (Del. Ch. 2015) (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)).

[137] According to 8 Del. C. § 102(b)(7)(ii), an exculpatory provision limiting the personal liability of a director for breach of fiduciary duty cannot eliminate liability for "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law."  8 Del. C. § 102(b)(7)(ii).

[138] *See* Pl.'s Omnibus Answering Br., at 33.

acquisition and based upon a forensic investigation of Levandowski's retention of Google IP, Uber's General Counsel told Kalanick that she had serious reservations about the acquisition. From these allegations, a reasonable inference can be drawn that Kalanick was aware of Stroz' preliminary and final findings, or, at least, that he had knowledge of their substance (*i.e.*, that Levandowski and others at Otto knowingly retained Google IP). The Plaintiff alleges that Kalanick did not specifically share the results of Stroz' preliminary findings with Uber's Board when Kalanick presented the acquisition. According to the Plaintiff, this was a breach of Kalanick's fiduciary duties of loyalty and care as an officer of Uber, and it was also a breach of his non-exculpated fiduciary duties as a director.

At this pleading stage, I must accept the Plaintiff's assertion that Kalanick was aware that the Otto transaction would result in misappropriation of IP from Google, but that he did not inform the Board in either his capacity as an officer of Uber or as a director. Withholding such information would be a violation of Kalanick's fiduciary duty of loyalty as an officer of Uber. The fiduciary duties of officers generally mirror those of directors;[139] however, shareholders cannot indemnify officers for breaches of fiduciary duties under Section 102(b)(7).[140] Kalanick was

---

[139] *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009) ("In the past, we have implied that officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors. We now explicitly so hold.") (internal citations omitted).

[140] *In re Rural Metro Corp.*, 88 A.3d 54, 86–87 (Del. Ch. 2014) ("[T]he Delaware Supreme Court has noted that Section 102(b)(7) does not protect officers.") (internal citations omitted); *see also*

also a director, and even if he is indemnified to the full extent of Section 102(b)(7), personal liability cannot be eliminated for "intentional misconduct or a knowing violation of law."[141] The Plaintiff here alleges that, with knowledge that Levandowski had retained Google IP, Kalanick plotted to steal that IP through the acquisition of Otto. Therefore, it is reasonable to infer from the allegations that Kalanick breached his fiduciary duty of loyalty as a director, as well. As a result, at least one member on the Demand Board, Kalanick, faces a substantial likelihood of liability and cannot consider demand impartially.[142]

> b. *The Plaintiff Has Failed to Plead Bad Faith by the Other Directors*

The Plaintiff's argument, as I understand it,[143] is that the directors (other than Kalanick) at the time the Otto acquisition was approved[144] acted in bad faith because they had a "duty to act" to inform themselves of Stroz' preliminary findings.[145] A

---

*Gantler*, 965 A.2d at 709 n.37 ("Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers.").

[141] 8 Del. C. § 102(b)(7)(ii).

[142] This determination is based upon allegations pled in the Amended Complaint. Of course, these remain allegations and I hold no opinion, at this point, about any actual breaches of duty by Kalanick.

[143] The Plaintiff implies that the directors took an action (approving the merger with Otto), the consequence of which was a violation of law (stealing Google's IP). Pl.'s Omnibus Answering Br., at 34–36, 55. However, the Plaintiff does not explicitly base his argument for director bad faith on a knowing violation of law by the Defendant Directors (save Kalanick); to the extent such an argument is implied, I find that it is only supported by conclusory allegations in the Plaintiff's Amended Complaint. I note that in the Merger Agreement, Otto made representations that it owned its IP.

[144] The directors at the time were Kalanick, Camp, Graves, Gurley, and Bonderman.

[145] Pl.'s Omnibus Answering Br., at 34–50.

director's failure to inform herself, where the failure is sufficient to implicate gross negligence—that is, reckless indifference to duty—is a breach of her fiduciary duty of care. Absent bad faith, however, a director's failure to inform herself is *only* a breach of duty of care, which can be, and here was, exculpated.[146] Bad faith would implicate a non-exculpated breach of the duty of loyalty. A sufficient allegation of bad faith, however, requires pleading "either [1] an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties or [2] that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[147] Bad faith requires an intentional dereliction; "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."[148]

According to the Plaintiff, the directors had a duty to inform themselves of Stroz' preliminary findings, breach of which amounts to bad faith. This is because the directors were aware of several key facts: that Uber with Kalanick as a CEO had a history of violating the law and engaging in unethical conduct, that the terms of the Merger Agreement indemnified Otto for disclosed bad acts including IP

---

[146] Breaches of the duty of care can be exculpated under Section 102(b)(7). *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1180 n.27 (Del. 2015) (explaining prior Supreme Court precedent). The purpose of allowing exculpation is to "free[ ] . . . directors to take business risks without worrying about negligence lawsuits." *Id.* at 1185.

[147] *In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017) (citations omitted).

[148] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).

misappropriation, and that a third-party investigator had been hired to conduct due diligence on Otto. In other words, according to the Plaintiff, the directors knew that they had a duty to act to inform themselves of the investigator's preliminary findings, independent of management's representations, which they consciously disregarded[149] when they approved the acquisition.[150] According to the Plaintiff, the directors' failure to investigate primary sources, in light of these facts, goes beyond gross negligence to bad faith. A director's failure to inform herself, sufficient to amount to gross negligence, still states only an exculpated claim for breach of duty of care;[151] again, to demonstrate a substantial likelihood of liability here requires a sufficient pleading of breach of the duty of loyalty (in this instance, the Plaintiff pleads bad faith or waste).

The Plaintiff also argues that the directors at the time of closing[152] acted in bad faith—again, given their knowledge of Uber's corporate culture of lawbreaking,

---

[149] I note that "[c]onscious disregard for fiduciary duties is not the only form bad faith can take; a lack of good faith may also be shown where a director intentionally pursues goals other than the best interests of the stockholders." *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *11 (Del. Ch. Mar. 19, 2018) (citing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006)). However, the Plaintiff does not plead that directors pursued such goals in approving the Otto acquisition.

[150] Pleading bad faith via a showing of conscious disregard of duties does not require a pleading of motive, such as personal interest. *See, e.g.*, *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

[151] *McMullin v. Beran*, 765 A.2d 910, 921 (Del. 2000) ("Director liability for breaching the duty of care 'is predicated upon concepts of gross negligence.'") (internal citations and quotations omitted).

[152] The directors at the time of closing were Kalanick, Camp, Graves, Gurley, Bonderman, Huffington, and Al-Rumayyan.

the merger's indemnification terms, and the presence of an independent investigator—by allowing the transaction *to close* without reviewing Stroz' final report. I consider the Plaintiff's arguments on approval of the merger before turning to closing.

i. Approving the Transaction

At the time the transaction was approved, only three members of the Demand Board were serving as directors; they are Kalanick, Camp, and Graves. The Plaintiff does not allege that any director other than Kalanick saw or otherwise had knowledge of Stroz' preliminary findings. The Plaintiff's Amended Complaint acknowledges that Kalanick, who was CEO at the time, made a presentation to the Board regarding the Otto transaction. The Plaintiff alleges that the Board was not shown, and did not specifically request, Stroz' preliminary findings before approving the transaction. From the few other allegations made about the management presentation and the Board's decision-making process, it appears that the Board discussed the indemnification terms of the Merger Agreement and the potential for litigation with Google.

The Plaintiff does not allege that Kalanick's presentation or the Board's decision-making process were lacking in any way *except* in terms of knowledge of Stroz' preliminary findings. The Plaintiff did not bring a Section 220 action to explore the details of the Board's deliberation on the Otto acquisition. At Oral

31

Argument and in subsequent supplemental letters, the parties contested the extent to which other documents that illuminate the presentation and the Board's decision are incorporated into the Amended Complaint.[153] The Plaintiff's Amended Complaint, even with the incorporated documents, alleges very little about these topics except that diligence was, at least minimally, discussed and represented to be "okay." I draw no further inferences. To the extent that the parties now argue about the sufficiency of management's presentation and the Board's decision-making process, for example in the context of 8 Del. C. § 141(e),[154] such arguments are misplaced. The Plaintiff has only challenged the Defendant Directors' failure to personally review Stroz' findings (both preliminary and final), and the failure of Officer Defendants to specifically share Stroz' findings (or similar knowledge of IP misappropriation) with the Board.

The Plaintiff argues that the directors could not rely on Kalanick because of his and Uber's past history of unlawful conduct. Instead, per the Plaintiff, the directors had a duty to personally review Stroz' preliminary findings, no matter what

---

[153] For example, in the Amended Complaint, the Plaintiff cites to sections of Gurley's testimony in another litigation. The Defendants seek to introduce more testimony from the same litigation, which would illuminate the Board's discussions during their meeting and the Board's reliance on management's presentation. The Plaintiff contests that this additional testimony was incorporated in the Amended Complaint, and I have not considered it beyond Gurley's full answer, which is only partially referenced in the Amended Complaint, as discussed *supra*.

[154] Opening Br. of Defs. Camp, Graves, Huffington, Al-Rumayyan, Gurley and Bonderman in Support of Mot. to Dismiss, at 20; Reply Br. of Defs. Camp, Graves, Huffington, Al-Rumayyan, Gurley and Bonderman in Support of Mot. to Dismiss, at 13; Oral Argument Tr. 14:24–15:5, 65:14–16, 76:13–17; D.I. 96.

management told them. Additionally, the Plaintiff argues that the indemnification provisions of the Merger Agreement and accompanying side agreements should have triggered the same directorial duty to act to inform themselves of Stroz' preliminary findings. However, the Plaintiff ultimately fails to plead that the directors did more than violate a duty of care, which here is an exculpated claim.[155]

The Plaintiff suggests that his allegations are sufficient to plead bad faith in line with this Court's ruling in *In re Massey Energy Company*.[156] In *Massey*, this Court, on a motion for a preliminary injunction to enjoin a merger, sought to review whether a company's derivative claims had value, in particular a *Caremark* claim.[157] The underpinning of a *Caremark* claim, as our Supreme Court in *Stone v. Ritter* explained, is where directors "fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities."[158] In a *Caremark* claim, the "imposition of liability [therefore] requires a showing that the directors knew that they were not discharging their fiduciary obligations."[159]

---

[155] *See, e.g.*, *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017) ("When, like here, the directors are protected from liability for due care violations under § 102(b)(7) of the Delaware General Corporation Law, the plaintiff must allege with particularity that the directors acted with scienter . . . .").

[156] 2011 WL 2176479 (Del. Ch. May 31, 2011).

[157] *Id.* at *17–18. A *Caremark* claim is so named for the Court of Chancery case *In re Caremark International Inc. Derivative Litigation*. 698 A.2d 959 (Del. Ch. 1996); *see also Stone v. Ritter*, 911 A.2d 362, 364 (Del. 2006) ("[C]haracterized . . . as a 'classic Caremark claim,' a claim that derives its name from *In re Caremark International Inc. Derivative Litigation*.") (internal quotations and citations omitted).

[158] 911 A.2d at 370 (citing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006)).

[159] *Id.* (citing *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

The Plaintiff argues that Camp and Graves (and the other Board members at the time) knew that Kalanick's decisions and representations could not be relied upon, given Uber's history of violating local regulations governing car-for-hire services and given Kalanick's previous failed venture, Scour. The Plaintiff compares his allegations to those in *Massey*, where this Court found the plaintiff's pleadings were likely[160] sufficient to meet the *Caremark* standard on a Rule 23.1 motion to dismiss.[161] The plaintiffs in *Massey* pled that Massey Energy Company, a mining company, "had pled guilty to criminal charges [for violating mine safety laws], had suffered other serious judgments and settlements as a result of violations of law, had been caught trying to hide violations of law and suppress material evidence, and had miners suffer death and serious injuries at its facilities," leading up to a serious mining disaster.[162] Those pleadings were sufficient to "create a pleading-stage inference that the top management of Massey" had breached its duty of loyalty "by knowingly causing [Massey] to seek profit by violating the law."[163] The Massey board was aware of the issues and purported to be "involved in

---

[160] This Court said "likely" because *Massey* was not before the Court on a Rule 23.1 motion to dismiss, rather it was before the Court on a preliminary injunction motion to enjoin a merger on the basis that the directors had failed "to secure the purported value of the Derivative Claims for [the company's] stockholders[;]" this Court then examined whether such claims were frivolous. *Massey*, 2011 WL 2176479 at *17–18.

[161] *Id.* at *21.

[162] *Id.* at *20.

[163] *Id.*

considering safety issues in the period leading up to [the serious mining disaster] and had taken steps to improve the company's safety record."[164] The Court wrote that:

> [Massey's] directors and officers cannot take comfort in the appearance of compliance motion at the pleading stage, when the plaintiffs are able to plead particularized facts creating an inference that the Board and management were aware of a troubling continuing pattern of non-compliance in fact and of a managerial attitude suggestive of a desire to fight with and hide evidence from the company's regulators.[165]

*Massey* and similar progeny of *Caremark* are distinguishable here. Unlike in *Massey*, where the inaction under consideration *and* the manifest and pervasive lawbreaking involved a single topic (mine safety), here the challenged decision of Uber's directors is not related to Uber's purported scofflaw history.[166]

The Plaintiff alleges, and at the pleading stage I accept as true, that Uber had a history of flouting local regulations and laws governing car-for-hire services. As an initial matter, the Plaintiffs have not sufficiently pled that specific Uber directors (outside Kalanick, who was also CEO) were aware or should have been aware of any lawbreaking regarding car-for-hire regulations.[167] I assume for purposes of

---

[164] *Id.* at *20.

[165] *Id.* at *21.

[166] *See, e.g.*, *Melbourne Mun. Firefighters' Pension Trust Fund v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016) ("The subsequent complained-of 'corporate trauma,' however, must be sufficiently similar to the misconduct implied by the 'red flags' such that the board's bad faith, 'conscious inaction' proximately caused that trauma.") (internal citations and quotations omitted), *aff'd*, 158 A.3d 449 (Del. 2017) (TABLE).

[167] *See South v. Baker*, 62 A.3d 1, 17–18 (Del. Ch. 2012) ("Although the complaint asserts that the directors knew of and ignored the 2011 safety incidents, the complaint nowhere alleges anything that the directors were told about the incidents, what the Board's response was, or even that the incidents were connected in any way. . . . Plaintiffs' counsel could not cite a single decision in which a court had inferred knowledge of wrong-doing or conscious indifference to alleged red

analysis that they were so aware. Regardless, the Plaintiff's claim against the directors is not that the directors did not stop Uber from breaking taxicab laws, but that they did not stop Uber from incurring liability for IP purloined by Levandowski in the Otto transaction. Assuming the directors were aware of the culture of taxicab violations, I cannot infer from that knowledge that the directors were also aware or should have been aware of Kalanick's alleged participation in Levandowski's IP theft.[168] The Plaintiff points to no previous acts—known or unknown to the directors—committed by Uber to misappropriate IP or other property. The Plaintiff attempts to rely on a pre-Uber failed venture, Scour, which, per the Plaintiff, implicated *Kalanick* in copyright infringement. The Plaintiff does not plead that the Board had knowledge of this, nor would that be a reasonable inference. Instead, the Plaintiff argues that the Board was well aware of what he characterizes as Kalanick's essential "bad character." This is not a sufficient red flag, in my mind, to convert a

flags under circumstances paralleling the plaintiffs' complaint, where the complaint's allegations did not attempt to set forth facts suggesting conscious indifference.") (internal citations omitted). Here, the Plaintiff, in support of his allegation that the Board "*specifically approved*" of "illicit culture" at Uber, cites only the allegation in the Amended Complaint that whistleblowers revealed that Kalanick and the Board did not scrutinize certain executives who were close to Kalanick. Pl.'s Omnibus Answering Br., at 37; Am. Compl. ¶ 30.

[168] For example, in *In re Dow Chemical Co. Derivative Litigation*, the plaintiffs "argue[d] because bribery may have occurred in the past ([the defendant] paid a fine to the SEC in January 2007), by different members of management, in a different country (India), and for a different transaction (pesticide registrations), the board should have suspected similar conduct by different members of management, in a different country, in an unrelated transaction." 2010 WL 66769, at *13 (Del. Ch. Jan. 11, 2010). This Court found the plaintiffs' argument in *In re Dow Chemical Co.* "simply too attenuated to support a Caremark claim." *Id.*

plain vanilla duty of care allegation into a persuasive pleading of bad faith on the part of the directors.

Neither is this situation akin to *In re The Walt Disney Company Derivative Litigation*, where this Court found "the facts alleged . . . suggest that the defendant directors consciously and intentionally disregarded their responsibilities . . ." and met the pleading-stage requirements for bad faith in a Rule 23.1 motion to dismiss.[169] The facts pled in *Disney*, which this Court found showed bad faith, are both more specific—the amended complaint in *Disney* followed a Section 220 request—and more egregious than those here. In *Disney*, the board approved a substantial hiring decision before the details, including compensation and termination, were even negotiated. The board then tasked the CEO with negotiating a contract—including those material terms—with the new hire, his friend of many years. This Court wrote in *Disney*:

> Less than one and one-half pages of the fifteen pages of Old Board minutes were devoted to discussions of Ovitz's hiring as Disney's new president. . . . No presentations were made to the Old Board regarding the terms of the draft agreement. No questions were raised, at least so far as the minutes reflect. At the end of the meeting, the Old Board authorized Ovitz's hiring as Disney's president. No further review or approval of the employment agreement occurred. Throughout both meetings, no expert consultant was present to advise the compensation committee or the Old Board. Notably, the Old Board approved Ovitz's hiring even though the employment agreement was still a "work in

---

[169] 825 A.2d 275, 289 (Del. Ch. 2003).

progress." The Old Board simply passed off the details to Ovitz and his good friend, Eisner.[170]

Again, in *Disney*, board approval occurred without any review of material terms because those terms had not yet been proposed; the board simply gave the CEO *carte blanche*. Nothing similar is alleged here.

Here, the Plaintiff acknowledges that the directors held a meeting to approve the Otto acquisition, where Kalanick gave a presentation, and at which the Board discussed the indemnification terms of the Merger Agreement and the potential for litigation with Google. All that is pled with respect to the Uber Board is that it accepted management's representations without examining directly the diligence report produced by Stroz. In the interstices between what the Plaintiff here pled and what was pled in *Disney* resides, to my mind, the line between a lack of care and a lack of good faith. Similarly, *Amalgamated Bank v. Yahoo! Inc.* involves issues not present here;[171] issues of executive compensation necessarily alert a board to the dangers of deference solely to the judgment of those same executives.[172] Here, such a conflict was absent, and the Plaintiff does not contend that Uber's management

---

[170] *Id.* at 287.
[171] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 783 (Del. Ch. 2016); *see also* Pl.'s Omnibus Answering Br., at 43 (first citing *Disney*, 825 A.2d 289; and then citing *Yahoo!*, 132 A.3d at 783).
[172] *Yahoo!*, 132 A.3d at 783 ("A board cannot mindlessly swallow information, particularly in the area of executive compensation: 'While there may be instances in which a board may act with deference to corporate officers' judgments, executive compensation is not one of those instances. The board must exercise its own business judgment in approving an executive compensation transaction.'") (quoting *Haywood v. Ambase Corp.*, 2005 WL 2130614, at *6 (Del. Ch. Aug. 22, 2005)).

was otherwise improperly interested or conflicted in the Otto transaction. Furthermore, the Plaintiff does not allege that Uber's directors did nothing; rather, the Plaintiff acknowledges that Uber's directors met, received a presentation, asked certain questions, and made a decision. The Plaintiff chose not to bring a Section 220 demand in connection with his allegations that the directors did not review Stroz' preliminary findings or ask about them. I do not find that the directors' failure to ask for those findings is akin to the conscious abdication of responsibility in *Disney* or *Yahoo!*. To the extent the Plaintiff makes a broader "rubberstamping" argument about the Board's decision, the Plaintiff has not pled facts from which such an inference can be drawn.

The Plaintiff also contends that it was an act of bad faith for the directors to rely on representations by Kalanick, and by extension by management. I have already explained above why Uber's purported taxicab law violations (under Kalanick's guidance) did not give rise to a non-exculpated duty to further question the acquisition here. The Plaintiff's allegation that Kalanick, in particular, could not be relied upon (per the Plaintiff, necessitating personal directorial review of Stroz' preliminary findings) focuses largely on the same purported lawbreaking activity.[173]

---

[173] Not only is such lawbreaking activity, again, unrelated to the acquisition of Otto, but it also speaks only to the manner in which Uber and Kalanick dealt with *third parties*. The Plaintiff, however, does not allege that Kalanick had a history of deception when it came to Uber's own Board. The Plaintiff's pleadings do not raise a reasonable inference that Kalanick had lied previously to his own Board, much less that the Board knew or consciously disregarded the fact that he would.

39

I find that the Plaintiff has not sufficiently pled that the directors consciously disregarded their known responsibilities in the Otto acquisition, and thereby breached their duty of loyalty.

Additionally, the Plaintiff argues that, despite Kalanick's representations, the specifics of the Otto transaction should have caused the Board to investigate further before approving the deal, and are in fact so unusual as to imply scienter. The Plaintiff specifically points to the indemnification terms of the Merger Agreement.[174] Those fail, in my mind, to give rise to a reasonable inference that the "decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[175] It was no secret that Uber was buying Otto not for its operations, but for its personnel. Uber was highly interested

---

[174] To the extent that the Plaintiff argues that the Board must have known of a plan to illegally appropriate Google technology via the Otto merger, given the sales price, I find that argument unpersuasive. The Plaintiff suggests that Uber would not have paid $680 million for a legitimate start-up in Otto's condition; therefore, it must have been apparent to the directors at the time that Otto was a vehicle for theft. The Defendants aver (and the Plaintiff acknowledges), however, that the up-front cash payment by Uber to acquire Otto was a modest $100,000. The additional value was conditional on milestones being met by 2030. *See* Pl.'s Omnibus Answering Br., at 21–22. The Plaintiff argues vehemently that the earn-outs are scams, presumably meant to make it appear that the terms of the Otto acquisition are reasonable. Per the Plaintiff, the earn-outs are structured such that they are "virtually asur[ed to] vest," thus ultimately compensating Levandowski and his cohorts for the stolen Google technology. *Id.* The Plaintiff also points out, correctly, that the true nature of the earn-outs in any event is not in the record, and must not be considered on a motion to dismiss. I agree that, to the extent the Defendants argue that the transaction should be valued at under $680 million, such argument is unavailing on this record. But assuming it is true that, as the Plaintiff argues, the conditional nature of the payments above $100,000 is illusory, that fact is irrelevant *unless the Defendant Directors knew such to be the case*, which is neither pled in, nor a reasonable inference to be drawn from, the complaint. In other words, it is not reasonable to infer that the purchase price and structure of the transaction alone are sufficient to imply the Defendant Directors' scienter.

[175] *In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017) (citations omitted).

40

in developing a self-driving car, Google was a leader in that emerging field, Uber wanted to attract Google's engineering talent to design its self-driving auto, and the Board entered a transaction to accomplish that goal. Indemnification of those engineers was a part of this transaction; the Plaintiff himself alleges that the Board specifically discussed the indemnification. The Plaintiff points to a number of unusual features and risks in the transaction, known to, and approved, by the Board. I consider those in examining the Director Defendants' good faith. However, I cannot infer from those features of the merger that the Director Defendants must have known the transaction was illicit. Absent knowledge of an intent to steal IP, the fact that the directors agree to indemnification terms that create corporate risk does not imply a breach of a duty of loyalty.

If the Plaintiff's allegations are true, the directors who approved the Otto acquisition approved a questionable transaction without fully informing themselves. Their decision ultimately damaged Uber. Nonetheless, a failure to follow best practices is not necessarily a breach of fiduciary duty. Negligent oversight by directors, although certainly not commendable, is not a breach of fiduciary duty. Even grossly negligent board action does not imply a non-exculpated breach. A breach of the duty of loyalty via bad faith, as alleged here, requires disregard so profound that it raises an inference of scienter. I do not find that the directors' failure

41

to inform themselves about the specifics of Stroz' preliminary findings is so profound as to raise that inference.

## ii. Allowing the transaction to close

The Plaintiff also alleges that the Uber Board "breached its duties" by allowing the Otto transaction to close.[176]  According to the Plaintiff, Stroz' final report, which was available prior to closing, contained information that, if read in conjunction with the Merger Agreement, showed that Otto had breached its representations in the Merger Agreement regarding IP ownership.[177]  Uber, per the Plaintiffs, was therefore entitled to walk away from the deal.  The directors, which by closing included Huffington and Al-Rumayyan, did not read the final Stroz report and did not attempt to stop closing.  After closing, Google sued Uber for IP infringement, and Uber paid a settlement to Google.  The Plaintiff contends that the Uber directors, in not reviewing the final report, breached non-exculpated fiduciary duties.  The Plaintiff's argument is that the Uber directors acted in bad faith because they had a duty to inform themselves of the final Stroz report prior to the closing of the transaction, but did not do so.[178]

---

[176] *Id.* at 50

[177] The Plaintiffs do not allege that Stroz' final report made any explicit determinations regarding representations in the Merger Agreement.  Instead, the Plaintiff's argument, as I understand it, is that Stroz' final report found that Otto employees had retained IP from Google, which could have been used by Uber as a basis to argue that Otto had breached representations in the Merger Agreement, and thus avoid the Agreement.

[178] The Defendants argue that the directors could have reviewed Stroz' final report, and, with knowledge of its contents, nonetheless made a business decision to close the transaction.  *See, e.g.*,

42

The Plaintiff's argument for a non-exculpated breach of duty related to the directors' actions at closing is that the directors were aware (or should have been aware) of the possibility that Otto had misappropriated IP, and that Uber had taken on the risk of that misappropriation. The directors, per the Plaintiff, could have further informed themselves via Stroz' final report, but consciously disregarded the risk to Uber by not personally reviewing that report. For the same reasons addressed above, I do not find failure to review the report to be a conscious breach of duty amounting to bad faith.

To the extent the Plaintiff bases his argument on Uber's past bad acts under Kalanick's leadership, I have already rejected the notion that such violations— regarding taxicab regulations—raised red flags and created a duty to act when it came to an acquisition that might involve IP infringement. In considering entry of the Merger Agreement, I similarly found that the indemnification terms of that Agreement did not reflect director knowledge of or conscious disregard that Otto had misappropriated IP. The same logic follows for allowing the transaction to close. The Plaintiffs have not sufficiently pled that the directors knew IP misappropriation was not a simply a risk, but was actually Kalanick's goal, and that,

Opening Br. in Support of Nom. Def. Uber's Mot. to Dismiss, at 33–34. At Oral Argument, the Plaintiff argued that this is irrelevant to whether the Defendant Directors acted in bad faith; I need not resolve this issue here. *See* Oral Argument Tr. 82:13–17. It is also unnecessary to resolve the parties' related dispute concerning whether Otto breached certain representations and whether, therefore, Uber had the ability to terminate the Merger Agreement prior to closing.

in light of that knowledge, the directors closed their eyes to evidence of IP misappropriation by refusing to look at Stroz' final report. The Amended Complaint does not allege that the Board knew that the report was available, nor that management made the Board aware of the existence of any new information learned after approval of the Merger Agreement regarding IP theft by Otto. Therefore, any breach by the directors sounds in care, not loyalty. As in *Stone v. Ritter*, "[t]he lacuna in the plaintiff['s] argument is a failure to recognize that the directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating . . . laws, or from causing the corporation to incur significant financial liability, or both."[179]

### c. Corporate Waste

The Plaintiff also brings a claim for waste against the Director Defendants, five of whom are members of the Demand Board. "To state a claim for waste, a stockholder must allege, with particularity, that the board authorized action that no reasonable person would consider fair."[180] The Plaintiff argues that the Director Defendants consciously made a choice to avoid learning that the Otto transaction was an illegal attempt to steal Google's IP.[181] Therefore, per the Plaintiff, the

---

[179] *Stone v. Ritter*, 911 A.2d 362, 373 (Del. 2006).
[180] *Freedman v. Adams*, 58 A.3d 414, 417 (Del. 2013).
[181] Pl.'s Omnibus Answering Br., at 65.

44

transaction lacked a legitimate and legal purpose.[182]  But this is simply the bad faith claim I have rejected above.  Stripped of bad faith, all the Plaintiff alleges is that the Defendants caused Uber to enter a risky transaction without adequately informing themselves.  This is not waste.

### 3. A Majority of the Uber Board Is Independent

The Plaintiff claims that five members of the Demand Board have a substantial likelihood of liability.  I have found that only one, Kalanick, faces a substantial likelihood of liability.  As a result, the Plaintiff must demonstrate that at least five additional members of the Demand Board lack independence in order to demonstrate demand futility.  In "the demand-excusal context, . . . the board is presumed to be independent."[183]  "Independence is a fact-specific determination made in the context of a particular case. The court must make that determination by answering the inquiries: independent from whom and independent for what purpose?"[184]  Under this framework, the Plaintiff here must plead that the directors of the Demand Board lacked independence from Kalanick, who faces a substantial likelihood of liability, or that they lacked independence from another individual or entity that was interested in the transaction.

---

[182] *Id.* at 66; *see also* Am. Compl. ¶ 133.
[183] *See Beam v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004).
[184] *Id.* at 1050.

45

In order to demonstrate lack of independence, a plaintiff must demonstrate "ties [that] are *material*, in the sense that the alleged ties could have affected the impartiality of the director."[185] The materiality inquiry must focus on the financial circumstances or personal affinities of the particular director in question.[186]

The Plaintiff does not contend that Al-Rumayyan lacks independence.[187] The Plaintiff does submit that Camp, Graves, Thain, Burns, and Huffington are not independent of Kalanick. The Plaintiff also argues that Cohler is not independent of Gurley, and that Trujillo is not independent of Bonderman.[188] I address each allegation below and find that the Plaintiff has, at most, pled that three directors on the Demand Board, together with Kalanick, lack independence. Upon review, based on the allegations here, I find that there is no reasonable doubt that at least seven out of the eleven members of the Demand Board are disinterested and independent. Accordingly, the Plaintiff has failed to plead demand futility consistent with *Rales*.

a. Cohler and Trujillo Are Independent

i. Matt Cohler

---

[185] *In re MFW S'holders Litig.*, 67 A.3d 496, 509–510 (Del. Ch. May 29, 2013) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del. 1993)).

[186] *See, e.g., id.* at 510 ("[I]t is necessary to look to the financial circumstances of the director in question to determine materiality.").

[187] *See* Am. Compl. ¶ 112; *see also, generally*, Am. Compl.; Pl.'s Omnibus Answering Br., at 59–64.

[188] I note that the Plaintiff brings a claim against Yoo, an officer of Uber; however, the Plaintiff makes no argument that any of the members of the Demand Board lack independence from Yoo. *See generally* Am. Compl. I do not consider the claim against her at this juncture.

46

Gurley, who served on Uber's Board at the time the merger with Otto was approved and closed, left the Board in 2017. Gurley and Cohler are both partners at Benchmark, and Cohler replaced Gurley on Uber's Board. The Plaintiff alleges that Cohler is not independent from Gurley because they are both partners at the same investment fund, and because Gurley was Cohler's mentor at that fund.[189] However, independence is only relevant here if Gurley stands a substantial likelihood of liability. The Plaintiff alleges that Gurley faces a substantial likelihood of liability because he was on Uber's board when it approved the Otto merger. But, I found above that the directors who approved the merger with Otto (and then allowed the merger to close) do not face a substantial likelihood of liability. As a result, I need not reach the question of independence between Cohler and Gurley, because their relationship is unlikely to be implicated. Therefore, the Plaintiff has not shown a reasonable doubt that Cohler cannot be impartial when considering demand.

## ii. David Trujillo

The allegations against Trujillo mirror those against Cohler. Bonderman served on Uber's Board at the time the merger with Otto was approved and closed; he left the Board in 2017. Bonderman and Trujillo are both partners at TPG. When Bonderman left the Board, Trujillo replaced him. The Plaintiff alleges that Trujillo is not independent from Bonderman because they are both partners at TPG. As with

[189] Pl.'s Omnibus Answering Br., at 60–62; Am. Compl. ¶¶ 114–115.

47

Gurley and Cohler, however, Trujillo's independence from Bonderman is only implicated if Bonderman has a substantial likelihood of liability. Again, I found above that the directors of Uber who served when the Board approved the Otto merger do not face a substantial likelihood of liability. I need not inquire into the relationship between Bonderman and Trujillo. As the Plaintiff does not allege that Trujillo would otherwise be conflicted, the Plaintiff has not shown that Trujillo cannot impartially consider demand here.

### b. Graves and Thain Are Independent from Kalanick

### i. Ryan Graves

Kalanick hired Graves as Uber's first employee.[190] Graves served as Uber's CEO in 2010, before amicably stepping down to become general manager.[191] The Plaintiff argues that, as Kalanick's friend, Graves lacks independence. As our Supreme Court has made clear, directors, like all human actors, can have personal loyalties that cloud their ability to comply with fiduciary duties. Thus, long and close personal friendships may, in specific circumstances, raise a reasonable doubt of a director's ability to exercise business judgment.[192] However, such relationships must be pled with particularity to overcome the presumption of independence. The

---

[190] Am. Compl. ¶ 107.

[191] *Id.*

[192] In *Delaware County Employees Retirement Fund v. Sanchez*, our Supreme Court found that a "half century" close friendship was likely considered "precious" and when "a close relationship endures for that long, a pleading stage inference arises that it is important to the parties." 124 A.3d 1017, 1022 (Del. 2015).

48

only allegation here, in addition to a long-term employee relationship, is the conclusory assertion that Kalanick and Graves are "close," and that Graves is described—by parties unknown—as Kalanick's "confidant" and "ally."[193] Such allegations are of insufficient specificity to support a claim that the two have such a close personal relationship that Graves lacks independence.

The Plaintiff also implies that Graves is not independent of Kalanick because Graves has derived substantial wealth from Uber.[194] I note that Kalanick, while still a director, is no longer CEO of Uber, nor does he hold another management position; likewise, it seems that Graves, while still a director, no longer holds a management position at Uber.[195] The Plaintiff has not pled any facts to suggest—nor has he even made conclusory allegations—that Kalanick has any means to deprive Graves of the wealth Graves has accumulated, or that Kalanick has the ability to deprive Graves of wealth—let alone wealth that is material to Graves[196]—going forward. The fact

---

[193] Am. Compl. ¶ 108.

[194] *Id.* ¶ 107. The Plaintiff alleges that Graves, as a result of being hired by Kalanick, has "reaped millions of dollars in compensation over the years at Uber." *Id.*

[195] Graves resigned from his position as head of global operations on August 10, 2017. *Id.* ¶ 20.

[196] As then-Chancellor Chandler deftly explained in *Orman v. Cullman*:

> A director may be considered beholden to (and thus controlled by) another when the allegedly controlling entity has the unilateral power (whether direct or indirect through control over other decision makers), to decide whether the challenged director continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such subjective material importance to him that the threatened loss of that benefit might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction objectively.

794 A.2d 5, 25 n.50 (Del. Ch. 2002).

that Kalanick hired Graves as an employee, standing alone, is insufficient to raise a reasonable likelihood that Graves lacks independence.

## ii. John Thain

The Plaintiff alleges that Thain is not independent from Kalanick because Kalanick unilaterally appointed Thain to the Board "during a power struggle within Uber."[197] The Amended Complaint does not explain how Kalanick appointed Thain or whether Kalanick has the power to remove Thain;[198] however, the Plaintiff contended for the first time at Oral Argument that Kalanick has the power to remove Thain.[199] The Plaintiff does not allege that Thain has a personal or financial connection to Kalanick, nor does the Plaintiff allege that the directorship—including its monetary compensation—is of substantial material importance to Thain (that is, even assuming that Kalanick has the power to unilaterally remove Thain from the Board). Thus, I must decide whether Thain is independent based solely on the fact that Kalanick appointed him during a power struggle. This allegation alone is not sufficient to undermine Thain's independence; once appointed to the Board, a director is entitled to a presumption of independence.

As a result, I have no reasonable doubt that at least a seven-member majority of the Demand Board—Al-Rumayyan, Martello, Khosrowshahi, Cohler, Trujillo,

---

[197] Am. Compl. ¶ 117.
[198] *See generally* Am. Compl.
[199] *See* Oral Argument Tr. 85:18–87:13.

Graves, and Thain—are independent under *Rales*. I note that the Board, for all the Plaintiff's claims of dominance by Kalanick, was able to oust Kalanick from management in 2017.

For the sake of completeness, I address the allegations regarding the remaining directors below.

### iii. Ursula Burns

The Plaintiff alleges that Burns is not independent from Kalanick for two reasons: first, that Kalanick appointed Burns under the same circumstances as Thain, discussed above, and second, that Kalanick is a client of Burns's employer.[200] As an initial matter, the first contention fails for the same reasons discussed with respect to Thain. Regarding the second contention, the Plaintiff alleges that Burns works for the same public relations firm that Kalanick has retained to manage his image, and that because of this, Burns is not independent of Kalanick. Having already found that a majority of the Board is independent of Kalanick, I need not determine whether the Plaintiff has met its burden to raise reasonable doubt that Burns could consider a demand while her firm represents Kalanick. I do note, however, that the Plaintiff's pleading is conclusory or silent as to the materiality of the relationship between Kalanick and Burns's PR Firm, and with Burns herself.

---

[200] Am. Compl. ¶ 117.

### iv. Garrett Camp

The Plaintiff claims that Camp also lacks independence from Kalanick. In support of this allegation, the Plaintiff notes that Camp co-founded Uber with Kalanick, and that Kalanick is a "close personal friend" of Camp.[201] Again, this allegation would be troubling, if it were not merely conclusory. This is particularly the case in light of the fact that Camp and Kalanick are co-founders of Uber. While that fact alone does not by itself raise a reasonable doubt of Camp's independence,[202] a more robust pleading of Camp and Kalanick's relationship is easily conceivable. Again, I need not find Camp independent in order to find a majority of the Demand Board is composed of independent directors.

### v. Arianna Huffington

The Plaintiff alleges that Huffington was unilaterally appointed to the Board by Kalanick.[203] Purportedly, the two have a close personal relationship that preceded her appointment as director, as evidenced by their collaboration "on projects to promote Huffington's book."[204] Once appointed, Huffington defended Kalanick, both publicly and at Board meetings, at times when his leadership of Uber was

---

[201] *Id.* ¶ 109.

[202] *See, e.g.*, *Apple Computer, Inc. v. Exponential Tech., Inc.*, 1999 WL 39547, at *12 (Del. Ch. Jan. 21, 1999) ("The factual predicate, that [the defendant and a director] are cofounders, falls far short of raising a reasonable doubt as to [the director's] disinterestedness.").

[203] Am. Compl. ¶ 110.

[204] *Id.*

embroiled in controversy.[205]  That Huffington, as a director of Uber, defended Kalanick is not noteworthy unless the Plaintiff can raise a reasonable doubt via a showing that she did so because of their close personal relationship.

The Plaintiff alleges that the relationship between Kalanick and Huffington is "so close that Huffington visited Kalanick's family members in the hospital and made him omelettes."[206]  Such personal interaction is "suggestive of the type of very close personal relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment."[207]  While one instance is not indicative of Kalanick's and Huffington's entire relationship, the "standard does not require a plaintiff to plead a detailed calendar of social interaction to prove that directors have a very substantial personal relationship rendering them unable to act independently of each other."[208]  Because, notwithstanding Huffington, I find that the majority of the Board is independent, I need not determine whether allegations of hospital visits and omelet-making evince such a close personal relationship as to question Huffington's independence.  I note, however, that the pleadings here approach, if not cross, a line of director independence.

---

[205] *Id.*
[206] *Id.*
[207] *Sandys v. Pincus*, 152 A.3d 124, 130 (Del. 2016).
[208] *Id.* at 130.

### 4. Rule 23.1 Determination

The Plaintiff has failed to raise a reasonable doubt as to the independence of at least seven of the eleven members of the Demand Board. Those directors are capable of considering demand here. If it had been made, demand would not have been futile.

## III. CONCLUSION

The Plaintiff did not make a demand on Uber's Board. Such demand is necessary unless futile; here the Plaintiff has not sufficiently pled that at least seven of the eleven members of the Demand Board are either interested or lack independence. Therefore, there is no reasonable doubt that a majority of the Demand Board can be impartial, and the Plaintiff has fallen short of pleading demand futility. The action is dismissed under Rule 23.1.[209] An appropriate order is attached.

---

[209] Therefore, I need not reach the Defendants' Motions to Dismiss under Rule 12(b)(6).

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

LENZA H. MCELRATH, III, ) 
derivatively on behalf of UBER ) 
TECHNOLOGIES, INC., ) 
             ) 
            Plaintiff, ) 
             ) 
      v. ) C.A. No. 2017-0888-SG 
             ) 
TRAVIS KALANICK, GARRETT ) 
CAMP, RYAN GRAVES, ARIANNA ) 
HUFFINGTON, YASIR AL- ) 
RUMAYYAN, WILLIAM GURLEY, ) 
DAVID BONDERMAN, and SALLE ) 
YOO, ) 
             ) 
             Defendants, ) 
     -and- ) 
             ) 
UBER TECHNOLOGIES, INC., ) 
             ) 
            Nominal Defendant. ) 

## ORDER

AND NOW, this 1st day of April, 2019,

The Court having considered the Defendants' Motions to Dismiss, and for the reasons set forth in the Memorandum Opinion dated April 1, 2019.  IT IS HEREBY ORDERED that the Motion to Dismiss is GRANTED.

SO ORDERED.

/s/ Sam Glasscock III

Vice Chancellor